**IN THE FEDERAL DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MARK COURTNEY, *et al.*, | ) | CASE NO. 4:25-CV-00989 |
| | ) | |
| Plaintiffs, | ) | JUDGE CHARLES E. FLEMING |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF SALEM, OHIO, *et al.*, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER ENTERING PRELIMINARY** |
| Defendants. | ) | **INJUNCTION** |

On April 15, 2025, Plaintiffs Mark Courtney, 1717 State Street LLC, C&C Rental Investments LLC, Salem Cedar Ridge Apartments Ltd., Wilson Street LLC, and Lexington Rentals LLC ("Plaintiffs") filed a Complaint in the Columbiana Court of Common Pleas alleging that Defendants, City of Salem, Ohio (the "City") and its Director of Housing, maintain unconstitutional ordinances that govern rental properties within the City. (ECF No. 1-1). On April 23, 2025, Plaintiffs moved for a preliminary injunction to enjoin the city from enforcing these ordinances against them. (ECF No. 1-5).

On May 14, 2025, Defendants filed an Answer (ECF No. 1-3), Amended Answer (ECF No. 1-4), and removed the case to this Court. (ECF No. 1). Pursuant to this Court's May 16, 2025 non-document Order, Defendants responded to Plaintiffs' motion for preliminary injunction on May 30, 2025. (ECF No. 3). Plaintiffs filed their reply brief on June 6, 2025. (ECF No. 4). The Court held an evidentiary hearing on Plaintiffs' motion on September 18, 2025. (ECF No. 9, Tr. of Hr'g on Mot. for Prelim. Inj.). For the following reasons, Plaintiffs' motion for preliminary injunction is **GRANTED**.

1

I.   FACTUAL BACKGROUND

A. The City's Housing Code and Occupancy License Requirements

The City maintains a housing code to preserve its residents' health and safety by assuring adequate housing conditions. *Salem, Ohio, Rev. Ordinances* ch. 1309, § 2 (2021).[1] Prior to July 2024, § 1309.04, governing inspections and enforcement, read, in relevant part:

> (b) The Enforcing Official[2] is hereby authorized to make inspections to determine the condition of dwellings, dwelling units, rooming units, and premises located within the City, in order that he may perform the duty of safeguarding the health and safety of the occupants of dwellings and the general public. Any inspection report shall be sent to the owner, landlord or agent of the property.
>         . . .
> (d) Where no consent is obtained, the Enforcing Official shall inspect an occupied or unoccupied dwelling, dwelling unit, rooming unit or premises only after obtaining requisite legal authority through search warrants or otherwise.

§ 1309.04[(b)] & [(d)]. The housing code also required landlords to obtain an occupancy license to let their rental properties. In 2021, the code provided that "the initial issuance of an occupancy license shall be contingent upon the inspection of each dwelling unit to assure said unit meets the provisions of the Housing Code, the Zoning Code and applicable Fire Codes and amendments thereto." § 1309.10(a)[(7)]. Additionally, "[f]or the initial inspection and all reinspections thereafter, the owner, operator or occupant of every dwelling, dwelling unit and rooming unit or the person in charge thereof, shall give the Enforcing Official free access to such dwelling unit or rooming unit, and its premises at all reasonable times for the purpose of such inspection(s), examination(s), and survey." *Id.* To obtain an occupancy license,

---

[1] Unless further clarification is needed, references to the City's housing code will be preceded by the section (§) symbol.

[2] "Enforcing Official" refers to "the Director of Public Service, the Director of Environmental Health, their duly authorized representative(s), and the Housing Inspector(s) as the case may be, engaged in the enforcement of this code." § 1309.04(a) (2021).

2

the owner of the property occupied by a party other than the owner shall apply to the office of the Housing Inspector. Property owners are required to make application for an occupancy license within thirty days after the effective date of this code. One (1) application shall be filed per rental unit. The Office of Housing shall maintain application and inspection forms and require the submission of such information as deemed necessary to properly administer and implement the provisions of this code. An application must be completed for each unit. **An occupancy license may be issued by the Housing Inspector if,** *upon inspection of the property,* **it is determined that the property meets the requirements of applicable City Codes.**

*Id.* (emphasis added). If a rental unit owner did not pay for or renew his occupancy license, the City would assess the fee to the unit's property taxes, along with an additional $60.00 fee, which was meant to pay the City's cost of certifying the fee to the Columbiana County Auditor. §1309.10([b]).

On July 30, 2024, the City approved changes to its housing code, which included changes to the inspection and occupancy license requirements. *Salem, Ohio, Rev. Ordinances* ch. 1309 (2024). The above-quoted inspection language was removed and replaced with the following:

> (c) Except where an emergency as defined in Section 1309.03 exists, the Health Officer, or their duly authorized representative, previous to conducting an inspection of any occupied dwelling, dwelling unit, rooming unit, or premises, shall obtain the consent of an occupant of same or the consent of another individual possessing like authority over, or such other relationship to, the premises or effects sought to be inspected.
>
> (d) Except where an emergency as defined in Section 1309.03 exists, the Health Officer, or their duly authorized representative, previous to conducting an inspection of any occupied dwelling, dwelling unit, rooming unit, or premises, shall obtain consent of an owner of same or the consent of another individual possessing like authority over, or such other relationship to, the premises or effects sought to be inspected.
>
> (e) Where no emergency as defined in Section 1309.03 exists, and **where no consent is obtained, the Health Officer, or their duly authorized representative,** *shall inspect an occupied or unoccupied dwelling,* **dwelling unit, rooming unit, or premises** *only after obtaining requisite legal authority through an administrative warrant or otherwise.*

§ 1309.04(c)–(e) (emphasis added).

The occupancy-license requirements also changed in 2024.  One notable addition includes the imposition of criminal penalties for failure to comply with the occupancy license requirement:

> (4) No person or firm shall rent, or lease property to another person or firm without first obtaining an annual license as outlined in subsection (a) hereof.
>
> (5) Whoever violates this section shall be guilty of an unclassified misdemeanor of the third degree and subject to a fine of up to five hundred dollars ($500.00); and if the offender was previously convicted of or plead guilty to a violation of this section, the violator is subject to a fine of up to five hundred dollars ($500.00) and/or a jail term of up to sixty days.
>
> (6) Notwithstanding any other section of this Code, failure to renew an occupancy license is a minor misdemeanor.

§ 1309.10(a)(4)–(6).

The provision describing how to apply for a property license (quoted above) remained unchanged, except for three new provisions:

> (A)   New applicants shall provide any and all documentation as required in this code, as well as a fee of $35 (thirty-five dollars) for initial application and processing at the time of application.
>
> **(B)   At the time of application, an inspection, as outlined in this Code Section, shall be scheduled and completed.  *Failure to schedule an inspection at the time of application will result in the denial of* [sic] *application.***
>
> (C)   Upon receiving written confirmation from a Housing Inspector or Health Official that the dwelling unit meets the requirements set forth in this code and any and all remaining fees associated shall be [sic] paid and an occupancy license shall be issued in accordance with Section 1309.10.  The owner, landlord or agent of the property shall be responsible for making arrangements for such inspection(s) and must be present during the prescheduled inspection(s).  Inspections will occur annually for any units failing initial or any reinspection.  For [sic] non-owner-occupied dwelling passing reinspection, a reinspection will occur no later than three (3) years from the date of passing such inspection.

§ 1309.10(a)(7)(A)–(C) (emphasis added).  The 2024 amendment also removed the $60.00 additional fee to be charged when assessing an unpaid occupancy license fee to the unit's property

4

taxes. § 1309.10(b). Instead, if a rental unit owner failed to pay or renew his occupancy license fee, "the Director of Housing or Housing Inspector may revoke/suspend the occupancy license and order the vacancy of such premises until all fees associated with it have been paid." *Id.*

### B. The Parties' Dispute

Plaintiffs own numerous rental properties throughout the City. (ECF No 9, PageID #374–75). Under the 2021 housing code requirements, the City would send annually, and Courtney would pay annually, occupancy license invoices associated with each of Plaintiffs' rental units. (*Id.* at PageID #376–78). The invoices charged Plaintiffs $30.00 per unit for each occupancy license. (Pl. Exs. 1–3). Despite the inspection language in the 2021 housing code, Courtney never consented to any inspection related to occupancy license applications or renewals. (ECF No. 9, PageID #396) (describing two incidents in which occupants consented to an inspection based on complaints relating to property conditions); (*Id.* at PageID #398) (describing the City's drive-by inspections).

On January 24, 2025, Courtney received a certified letter from the City, dated November 1, 2024, concerning his occupancy licenses. (ECF No. 9, PageID #380; Pl. Ex. 9, P. 1). The letter indicated that Plaintiffs had to reapply for their occupancy licenses, pay an application fee and license fee for each unit, and schedule inspections of each unit. (*Id.*; Pl. Ex. 9, P. 1). The occupancy license fee had increased to $72.00 per unit. (*Id.*; Pl. Ex. 9, P. 1). The application fee, which the letter stated that the City would waive for existing license holders, amounted to $35.00 per application. (*Id.*). Enclosed with the letter were occupancy license invoices at the new $72.00 rate and new occupancy license applications for each of Plaintiffs' rental units. (Pl. Ex. 5–9). Regarding inspections, the new application stated, "After receiving an application for a rental housing license, the Housing Inspector needs to set up an inspection of the property. (Inspection

5

is to be within 5 working days of this application.).") (Pl. Ex. 1, P. 4). The letter informed Plaintiffs that their "failure to meet any of the criteria to obtain or maintain an occupancy license"—including the scheduling of an inspection—"may result in your occupancy license being revoked." (Pl. Ex. 9, P. 1).

Since the conditions of occupancy license approval included purportedly unconstitutional but nonetheless mandatory, agreed-to inspections, Plaintiffs did not submit occupancy applications or pay the associated fees.[3] (ECF No. 9, PageID #387). In July 2025, Plaintiffs began receiving past-due notices that stated the City's intent to levy the occupancy license fees against the rental units' property taxes if not paid by August 15, 2025, including an extra $60.00 fee per unit. (*Id.*; Pl. Ex. 10). On August 21, 2025,[4] Plaintiffs received a letter from the Defendant Kayla Crowl, the City's Director of Housing, informing them that their occupancy licenses had been revoked due to Plaintiffs' failures to consent to inspections of their rental units:

> Consensual scheduled inspections are one of the criteria [*sic*] to obtain and maintain occupancy licenses in the City of Salem. As a result of not meeting the inspection criteria, your occupancy licenses are hereby revoked. The occupancy licenses for the attached list of properties are now revoked and will need to be vacated in accordance with the Salem City Code in a time frame not to exceed 60 days.

(ECF No. 9, PageID #395; 420; ECF No. 1-4, PageID #127). Ms. Crowl testified that her August 21, 2025 letter, which skipped the administrative warrant provision and instead simply notified Plaintiffs that their occupancy licenses were revoked, was contrary to the City's housing code. (ECF No. 9, PageID #422). Ms. Crowl never informed Plaintiffs that her letter was sent in error, but testified that she never, in fact, revoked Plaintiffs' licenses. (*Id.* at PageID #423). Following

---

[3] Courtney testified that he is willing to place the occupancy license fee amount in escrow with the Clerk of Court pending a final determination of this action. (ECF No. 9, PageID #388).

[4] The letter is dated August 21, 2024; based on the timeline described in the evidence, the Court assumes that this is a typographical error.

receipt of the letter, Plaintiffs filed notices of appeal regarding the City's decision to revoke their occupancy licenses. (*Id.* at PageID #421).

### C. Plaintiffs' Motion for Preliminary Injunction

Plaintiffs moved for a preliminary injunction on May 14, 2025, asking that the City be enjoined from "requiring Plaintiffs to pay $72.00 per unit and arrange for warrantless inspections of each rental unit." (ECF No. 1-5, PageID #138). Regarding the $72.00 fee, Plaintiffs do not advance any argument in support of enjoining payment of this fee; Plaintiffs' arguments all concern mandatory consent to warrantless inspections and the *additional* fees and criminal penalties associated with their failure to consent. (*Id.* at PageID #139; ECF No. 4, PageID #163, 167). Plaintiffs' counsel also stated at the hearing, while objecting to the City's questions to Courtney about paying the occupancy license fees, that Plaintiffs are not seeking a preliminary injunction regarding the $72.00 fee: "[T]here is a separate claim contesting the validity of that fee, but that's not an issue in the preliminary – in this motion." (ECF No. 9, PageID #389). The Court therefore considers only the warrantless-inspection issue and associated penalties.

Plaintiffs take issue with the occupancy license application process described in § 1309.10. Although § 1309.04 provides for an administrative warrant procedure when a rental unit owner does not consent to inspection, § 1309.10 does not. It states that an occupancy license applicant's failure to schedule an inspection "will result in denial of the application." § 1309.10(a)(7)(B). Plaintiffs argue that this procedure places unconstitutional conditions on occupancy license applicants. (ECF No. 1-5, PageID #139; ECF No. 4, PageID #164).

Defendants deny the housing code coerces warrantless searches violative of the Fourth Amendment. (ECF No. 3, PageID #153–56). Though Defendants acknowledge the mandatory inspection language in §1309.10 (*id.* at PageID #151–52), they argue that § 1309.04's

administrative warrant procedure applies to § 1309.10's occupancy-license-application inspections. They also cite case law in an effort to justify the $60.00 fee, but do not acknowledge that the language permitting such fee in § 1309.10(b) was eliminated in the 2024 amendment. Instead, Defendants point the Court to a later-enacted fee schedule which includes the line item, "Occupancy License Late Fee $60.00 plus license fee (same)."

## II. MOTION STANDARD

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The party moving for a preliminary injunction must make a "clear showing" that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)). The movant need not meet every factor; rather, the factors are meant to be balanced against one another. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

The City's inspection requirement that includes obtaining an administrative warrant when consent to the inspection is denied (§ 1309.04) is constitutional. Administrative searches like the inspections required by the City violate the Fourth Amendment "when authorized and conducted without a warrant procedure." *Camara v. Mun. Ct.*, 387 U.S. 523, 534 (1967). The City also may not punish a landlord's refusal to consent to such a search with criminal penalties. *Id.* at 540; *see Thompson v. City of Oakwood*, 307 F. Supp. 3d 761, 772 (S.D. Ohio 2018) ("[A] municipality

8

violates the Fourth Amendment when it requires a property owner to consent to a warrantless inspection of their property or face a criminal penalty, unless a valid exception to the warrant requirement exists."). Section 1309.04, concerning inspection and enforcement, stays within these parameters: when a property requires inspection, the owner may either consent or decline. § 1309.04(c)–(e). When an owner declines, the City may nonetheless inspect the property "after obtaining requisite legal authority through an administrative search warrant or otherwise." § 1309.04(e). There is no criminal penalty attached to an owner's refusal to consent.

The same cannot be said for the occupancy license application process delineated in § 1309.10. Section 1309.10(a)(7)(B) explains that a landlord cannot obtain an occupancy license without scheduling an inspection, and there is no warrant option here; instead, "Failure to schedule an inspection at the time of application[] will result in denial of application." This inspection cannot be the inspection outlined in § 1309.04 because § 1309.10(a)(7)(B) refers only to an inspection "as outlined in this Code Section." The only inspection outlined in 1309.10 is the one to which landlords must consent to obtain an occupancy license.

Sections 1309.10(a)(4)–(6) provide that a landlord may not let his property without an occupancy license, and if he does, he will be charged with a minor misdemeanor and fined up to $500. It is apparent to the Court that Ms. Crowl sent her letter (informing Plaintiffs that their failure to consent to inspections automatically resulted in revocation of their occupancy license) pursuant to this provision. (ECF No. 9, PageID #395; 420; ECF No. 1-4, PageID #127). Crowl's testimony that her letter did not comply with the housing code and that Plaintiffs' licenses were not in fact revoked are not in keeping §§ 1309.10(a)(4)–(6) and 1309.10(a)(7)(B). These provisions mandate denial of such license and imposition of criminal penalties. Such a scheme violates the Supreme Court's directive in *Camera*.

9

Moreover, the $60.00 penalty the City informed Plaintiffs it plans to assess due to their nonpayment of occupancy license fees is without a basis in the housing code. The 2024 amendment eliminated the $60.00 additional fee to be charged when assessing an unpaid occupancy license fee to the unit's property taxes. § 1309.10(b). While the 2024 Fee Schedule provides a line item for the imposition of an occupancy license late fee, the code contains no provision triggering such fee. Even if the $60.00 were a valid part of the housing code, it operates against Plaintiffs—and anyone else who objects to a warrantless inspection—as a penalty for their refusal to waive their constitutional rights. Plaintiffs are therefore likely to succeed on the merits of their claim that §§ 1309.10(a)(5)–(6) and 1309.10(a)(7)(B) violate the Fourth Amendment and that the $60.00 fee should not be assessed against their properties as a penalty.

### B. Irreparable Harm

Irreparable harm, in the context of a preliminary injunction, is harm that is not fully compensable by money damages. *Int'l Union of Painters & Allied Trades Dist. Council No. 6 v. Smith*, 148 F.4th 365, 371 (6th Cir. 2025) (quoting *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). Harm is presumed irreparable when it was caused by a constitutional violation. *Castillo v. Whitmer*, 823 F. App'x 413, 417 (6th Cir. 2020). In particular, a violation of one's Fourth Amendment right against unreasonable searches and seizures has been considered irreparable by this Court and others. *See, e.g.*, *Midwest Retailer Associated, Ltd. v. City of Toledo*, 563 F. Supp. 2d 796, 812 (N.D. Ohio 2008) (finding irreparable harm when officers sought video recordings of inside a convenience store during closed hours in violation of the Fourth Amendment right against unreasonable searches); *Farm Lab. Org. Comm. v. Ohio State Hwy. Patrol*, 991 F. Supp. 895, 906 (N.D. Ohio 1997) (irreparable harm presumed when officer seized and confiscated motorist's immigration documents); *Brown v. Greene Cnty. Vocational Sch. Dist.*

*Bd. of Educ.*, 717 F. Supp. 3d 689, 696 (S.D. Ohio 2024) (irreparable harm presumed when teacher may have unreasonably seized a student when the teacher pinned the student to his chair and stood over him while he was lying on the floor). Here, the Court has already determined that Plaintiffs have a likelihood of success on the merits of their Fourth Amendment claim. The irreparable injury prong is therefore also satisfied.

### C. Likelihood of Substantial Harm to Others

When the court balances the equities on either side of a preliminary injunction, the Court must assess "whether the preliminary injunction would harm the party enjoined or others, and if so, whether such harm outweighs any irreparable harm established by the party seeking the injunction." *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1045 (N.D. Ohio 2003). A limited injunction, enjoining enforcement of §§ 1309.10(a)(5)–(6) and 1309.10(a)(7)(B) of the housing code and imposition of the $60.00 fee on Plaintiffs and others who refuse to consent to an inspection, will not harm the City or others impacted by the housing code. Leaving § 1309.10(a)(4) in place means that all landlords must still apply for an obtain an occupancy license in order to rent their properties. There will also be no concern that rental properties will continue to meet the housing code's requirements. That is because § 1309.10(a)(7)(C) conditions issuance of an occupancy license on confirmation "that the dwelling unit meets the requirements set forth in this code," and § 1309.04(c)–(e) provide for a constitutional inspection process that includes an administrative warrant procedure. Since there is no substantial harm to the City or others affected by the housing codes by enjoining enforcement of §§ 1309.10(a)(5)–(6) and 1309.10(a)(7)(B), and since the Court has already determined that the harm caused to Plaintiffs by the existing housing code is irreparable, the equities balance in Plaintiffs' favor.

### D. Public Interest

"The final factor to evaluate in deciding upon a motion for preliminary injunction is 'whether the public interest would be served by the issuance of the injunction.'" *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). When a constitutional right is at issue, whether an injunction would serve the public interest depends heavily on the movant's likelihood of success on the merits, since "it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). The Court has already determined that §§ 1309.10(a)(5)–(6) and 1309.10(a)(7)(B) are unconstitutional. It therefore serves the public interest to enjoin enforcement of §§ 1309.10(a)(5)–(6) and 1309.10(a)(7)(B).

## IV. CONCLUSION

Plaintiffs' Motion for Preliminary Injunction (ECF No. 1-5) is **GRANTED**. Defendants are hereby enjoined from enforcing §§ 1309.10(a)(5)–(6) and 1309.10(a)(7)(B) of the housing code. Defendants are also enjoined from enforcing the $60.00 penalty for late payment of the occupancy fee against Plaintiffs and others who refuse consent to a warrantless inspection. Since Plaintiffs did not request an injunction related to the occupancy license fees, the Court will not require Plaintiffs to place those moneys in escrow with the Clerk of Court.

**IT IS SO ORDERED.**

**Date: October 20, 2025**

_____
**CHARLES E. FLEMING**
**U.S. DISTRICT COURT JUDGE**